Jeremy Chou (ISB #5680)
Preston N. Carter (ISB #8462)
GIVENS PURSLEY LLP
601 West Bannock Street
Post Office Box 2720
Boise, Idaho  83701-2720
Telephone:  208-388-1200
Facsimile:  208-388-1300
jcc@givenspursley.com
pnc@givenspursley.com
4778920_10 [12849-2]

Attorneys for Meridian Cinemas, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MERIDIAN CINEMAS, LLC<br><br>                        Plaintiff,<br><br>        v.<br><br>COLONEL RALPH POWELL, Director of the Idaho State Police, in his official and individual capacities; LIEUTENANT COLONEL KEDRICK WILLS, Deputy Director of the Idaho State Police, in his official and individual capacities; and CAPTAIN RUSSELL WHEATLEY, Bureau Chief, Alcohol Beverage Control, Idaho State Police, in his official and individual capacities,<br><br>                        Defendants. | Case No. _____<br><br><br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

        Plaintiff Meridian Cinemas, LLC, an Idaho limited liability company ("Meridian

Cinemas"), complains and alleges the following against Defendants.

## INTRODUCTION

This case involves attempts by Defendants Captain Russell Wheatley, Colonel Ralph Powell, and Lieutenant Colonel Kedrick Wills (collectively, "Government Defendants"),[1] in their official and individual capacities, to punish constitutionally protected speech by threatening to revoke Meridian Cinemas' Liquor License for showing the R-rated movie "50 Shades of Grey." In Government Defendants' view, showing this movie violated an Idaho statute prohibiting movies that depict "[a]cts or simulated acts of sexual intercourse" or "[a]ny persons being touched, caressed, [or] fondled on the breast or buttocks" on licensed premises. *See* Idaho Code § 23-614(2).

In the Ninth Circuit, it is "clearly established that liquor regulations [cannot] be used to impose restrictions on speech that would otherwise be prohibited under the First Amendment." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1159 (9th Cir. 2000).  It is equally clear that liquor regulations cannot "constitutionally be employed to impede [Plaintiff's] right to display non-obscene art on the premises of an ABC license."  *Id.* at 1160.

So it is here. Government Defendants' attempt to revoke Meridian Cinemas' Liquor License is unconstitutional. As set forth in more detail below, Meridian Cinemas respectfully requests that the Court enjoin Government Defendants from enforcing the statute against it. Meridian Cinemas also requests declaratory relief and an award of damages caused by Government Defendants' conduct.

## PARTIES, JURISDICTION, AND VENUE

---

[1] Meridian Cinemas uses the term "Government Defendants" throughout this Verified Complaint to identify some or all of the Named Defendants. At all relevant times, upon information and belief, each of the Government Defendants was acting pursuant to his own authority or pursuant to authority that had been delegated to him, whether implicitly or explicitly, by another Government Defendant. At times, Government Defendants may have acted through an agent or representative under their authority and control.

1.      Meridian Cinemas is an Idaho limited liability company that owns and operates the Village Cinema & Backstage Bistro, a restaurant that serves food and beverages in the movie theater commonly known as the Village Cinema (the "Cinema").

2.      The Cinema is located in the Village at Meridian, 3711 E. Longwing Lane, Meridian, Idaho 83646.

3.      Meridian Cinemas is licensed to sell liquor by the drink, beer, and wine at the Cinema.

4.      Meridian Cinemas is named as a Defendant in the Second Amended Complaint for Revocation of Retail Alcohol Beverage License, attached as Exhibit 1 ("Second Amended Complaint").

5.      Government Defendants' actions have interfered with, and threaten to further interfere with, Meridian Cinemas' choice of what movies to show at the Cinema.

6.      The existence of Idaho Code § 23-614, coupled with Government Defendants' threat to revoke Meridian Cinemas' Liquor License, has interfered with, and will continue to interfere with, Meridian Cinemas' choice of what movies to show at the Cinema.

7.      Government Defendants' actions have also caused pecuniary damage to Meridian Cinemas.

8.      The relief requested from this Court would redress Meridian Cinemas' injuries by removing the immediate threat to Meridian Cinemas' Liquor License, by removing future threats to Meridian Cinemas' Liquor License based on movies that may be played in the future, and by providing compensation for the damages Meridian Cinemas has suffered as the result of Government Defendants' conduct.

9.      Defendant Ralph Powell is the Director of the Idaho State Police. His business address is listed as 700 Stratford Drive, Meridian, Idaho 83642.

10. Defendant Kedrick Wills is a Deputy Director of the Idaho State Police. His business address is listed as 700 Stratford Drive, Meridian, Idaho 83642.

11. Defendant Russell Wheatley is the Bureau Chief of the Alcohol Beverage Control bureau of the Idaho State Police ("ABC" or "Idaho ABC"). His business address is listed as 700 Stratford Drive, Meridian, Idaho 83642.

12. At all times relevant to this Verified Complaint, and as to all allegations against them, Government Defendants have acted under color of state law.

13. Upon information and belief, at all relevant times, Government Defendants have resided in Idaho.

14. Upon information and belief, at all relevant times, Government Defendants have been vested with the authority to enforce Idaho statutes regarding liquor licenses, including Idaho Code § 23-614.

15. Because Government Defendants have violated the First Amendment to the United States Constitution, this Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

16. Because Government Defendants reside in Idaho, and because acts giving rise to this Verified Complaint occurred in Idaho, venue in this Court is proper under 28 U.S.C. § 1291.

**LEGAL BACKGROUND**

*The statute*

17. In 1999, the Idaho legislature enacted a bill that was codified as Idaho Code § 23-614.[2]

---

[2] Upon information and belief, the relevant language was originally passed in 1976, re-codified in 1983 as Idaho Code § 23-1010A, and re-codified in 1999 in its current form.

18.     The Idaho State Police and its officers, including Government Defendants, are

responsible for enforcing Idaho Code § 23-614. *See* Idaho Code § 23-804 ("The Idaho state

police and the director thereof are hereby charged with the responsibility and duty of assisting in

the policing of the penal provisions of the Idaho liquor act in addition to other duties imposed

upon them by law . . . . Said Idaho state police under the direction of the director thereof shall

conduct investigations to obtain facts involving violations of the provisions of such laws and the

said director shall appoint a chief of enforcement of such laws . . . .").

19.     Idaho Code § 23-614 prohibits, among other things, "the following acts or

activities in or upon premises licensed pursuant to title 23, Idaho Code:

> (e) The **showing of films**, still pictures, electronic reproductions,
> or other visual reproductions **depicting**:
>
> (i) **acts or simulated acts of sexual intercourse**, masturbation,
> sodomy, bestiality, oral copulation, flagellation or any sexual acts
> which are prohibits by law.
>
> (ii) **any person being touched, caressed or fondled on the
> breast, buttocks**, anus or genitals.  . . . .

Idaho Code § 23-614(1)(e) (emphasis added).

20.     Violation of the statute is a misdemeanor, subject to a minimum sentence of thirty

days in jail or a fine of between $100 and $300 per occurrence. Idaho Code § 23-614(2).

21.     Upon conviction of a misdemeanor, the Director of the Idaho State Police "shall

review the circumstances and may take action he considers appropriate against the licensee

including suspension of the license for not to exceed six (6) months, a fine, or both such

suspension and a fine or may revoke the license." Idaho Code § 23-614(2).

22.     In addition to the criminal provisions, the statute authorizes the Director to "take

administrative action as provided in subsection (2) of this section against any licensee in the

event any person is found to have committed any of the above proscribed acts." Idaho Code § 23-614(3).

23.     In addition, Idaho Code § 23-933 purports to authorize the Director of the Idaho State Police to suspend, revoke, or refuse to renew a liquor license if the licensee violates provisions of Title 23 of the Idaho Code. The Second Amended Complaint cites this statutory provision as authority for revoking Meridian Cinemas' license. *See* Exhibit 1 at ¶¶1-6.

24.     Idaho Code § 23-614 purports to authorize the Director of the Idaho State Police to punish the owner of a licensed movie theater by suspending or revoking his or her liquor license, or by imposing a fine, based on the content of movies that the owner decides to show.

25.     Idaho Code § 23-614 purports to authorize the Director of the Idaho State Police to suspend or revoke a liquor license, or impose a fine upon the licensee, based on the content of movies that are not legally obscene and that have artistic merit.

26.     Accordingly, Idaho Code § 23-614 is a content-based restriction on speech that is prohibited by the First Amendment to the United States Constitution, as applied to non-obscene movies.

27.     Government Defendants have not identified any compelling state interest that supports Idaho Code § 23-614, as applied to non-obscene movies.

28.     Idaho Code § 23-614 is not narrowly tailored to achieve any compelling state interest, as applied to non-obscene movies.

*LSO, Ltd. v. Stroh*

29.     In 2000, the U.S. Court of Appeals for the Ninth Circuit heard an appeal from a district court's order granting qualified immunity to officials of the California Department of Alcoholic Beverage Control ("California ABC"). *LSO, Ltd. v. Stroh*, 205 F.3d 1145 (9th Cir. 2000), attached as Exhibit 2.

30.     In *LSO, Ltd.*, officials from the California ABC threatened to revoke a liquor license owned by the Palm Springs Convention Center if the Center allowed a third party to hold an exhibition of erotic art on the premises. *Id.*

31.     At the relevant time, California regulations prohibited, on any premises holding a liquor license, the showing of any film, still picture, electronic reproduction or other visual reproductions depicting, among other things:

> (1) Acts or simulated acts of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.
>
> (2) Any person being touched, caressed or fondled on the breast, buttocks, anus or genitals.

*LSO, Ltd.*, 205 F.3d at 1151 (citing Cal. Admin. Code, Title 4, Section 143.4).

32.     In relevant part, the prohibitions of this regulation are identical to those of Idaho Code § 23-614.

33.     The party that intended to hold the erotic art exhibit, LSO, Ltd., filed a lawsuit and obtained a temporary restraining order prohibiting the enforcement of the California regulation based on the erotic art exhibit. *LSO, Ltd.*, 205 F.3d at 1152.

34.     Afterwards, LSO filed an amended complaint seeking declaratory relief, injunctive relief, and damages against the officials who threatened to revoke the facility's liquor license. *LSO, Ltd.*, 205 F.3d at 1152. The district court granted summary judgment to the defendants, holding, among other things, that officials of the California ABC were entitled to qualified immunity. *Id.*

35.     On appeal, the Ninth Circuit reversed the district court's decision.

36.     The Ninth Circuit recognized that "content-based regulation of expression by the Government, even of indecent expression, is prohibited unless necessary to meet a compelling government interest." *LSO, Ltd.*, 205 F.3d at 1158 (citation omitted).

37.     The Ninth Circuit recognized that the case raised the question of "whether, under the circumstances, it was clear that LSO had the right to exhibit non-obscene art on the premises of an ABC licensee free of interference from state officials, even though some of the art fell within the proscriptions of a state liquor regulation governing expressive content at licensed establishments." *LSO, Ltd.*, 205 F.3d at 1158.

38.     The Ninth Circuit answered this question in the affirmative, holding that, as of 1997, "it was clearly established that liquor regulations could not be used to impose restrictions on speech that would otherwise be prohibited under the First Amendment." *LSO, Ltd.*, 205 F.3d at 1159.

39.     The Ninth Circuit also addressed the issue of whether, in 1997, a reasonable official could have believed that their conduct was lawful. *LSO, Ltd.*, 205 F.3d at 1159.

40.     It answered this question in the negative, holding that "in 1997 no reasonable official could have believed that Section 143.4 could constitutionally be employed to impede LSO's right to display non-obscene art on the premises of an ABC licensee." *LSO, Ltd.*, 205 F.3d at 1160.

41.     Upon information and belief, the California regulation was repealed after *LSO, Ltd.* was decided.

42.     Like the regulation at issue in *LSO, Ltd.*, Idaho Code § 23-614 is a content-based regulation of speech protected by the First Amendment.

43.     Accordingly, as of 2000, it was clearly established that Idaho liquor regulations, including Idaho Code § 23-614, could not be used to impose restrictions on speech that would otherwise be prohibited under the First Amendment.

44.     Accordingly, as of January 2000, no reasonable official could have believed that Idaho Code § 23-614 could constitutionally be employed to impede Meridian Cinema's right to

display non-obscene movies on its ABC-licensed premises, or to punish the display of non-obscene movies on its premises by revoking or threatening to revoke its liquor license.

## FACTUAL ALLEGATIONS

*Meridian Cinemas*

45.    Meridian Cinemas owns and operates a fifteen-screen theater at the Village at Meridian in Meridian, Idaho.

46.    Meridian Cinemas went to great lengths to design its theaters meet the requirements of Idaho law, with the consultation and cooperation of Government Defendants and Idaho ABC.

47.    In October 2013, Government Defendants issued Meridian Cinemas a license for the retail sale of liquor by the glass, beer, and wine (collectively, the "License" or "Liquor License").

48.    The License covers the VIP seating sections inside nine auditoriums, which are separated from general seating areas where no alcoholic beverages are served, and the Backstage Bistro, an area outside the auditoriums where no movies are shown. The licensed areas are restricted to persons aged 21 and older while alcohol is being served.

49.    The service of food and beverages, including alcoholic beverages, within the VIP areas and Backstage Bistro is an important component of Meridian Cinemas' business plan.

50.    Meridian Cinemas' Liquor License has substantial economic value, both standing alone and as an important component of Meridian Cinemas' business.

51.    Meridian Cinemas is a mainstream theater that shows movies rated "G," "PG-13," and "R" by the Motion Picture Association of America.

52.    Meridian Cinemas has never shown a movie with a rating higher than "R."

53.     As can be expected for a mainstream theater, Meridian Cinemas selects which movies to show based on a variety of factors, including the artistic merit of the movie, the anticipated popularity of the movie, the number of tickets the movie is anticipated to sell, the audience that Meridian Cinemas desires to attract, and other factors.

*Film ratings*

54.     The Classification and Rating Administration ("CARA") within the Motion Picture Association of America ("MPAA") issues ratings for films that are commercially distributed in the United States.

55.     Ratings are assigned on a scale of "G", suitable for general audiences, to "NC-17", a recommendation that persons under the age of 17 not attend.

56.     The rating "PG-13" indicates that the film may not contain content suitable for persons under the age of 13. Films with a "PG-13" rating may include brief nudity and some sexual content.

57.     The rating "R" indicates that persons under the age of 17 should not be admitted without an adult guardian. Films with an "R" rating may include adult themes, hard language, use of drugs, or sexually oriented nudity.

*Government Defendants' content-based threats of enforcement*

58.     It is commonplace for films shown in mainstream theaters, including Meridian Cinemas and other theaters with liquor licenses, to portray acts or simulated acts of sexual intercourse or persons being touched, caressed or fondled on the breast or buttocks.

59.     As an example, the following movies, nominated for the Academy Awards Oscar for "Best Picture" in 2013 through 2015, portray acts or simulated acts of sexual intercourse or persons being touched, caressed, or fondled on the breast or buttocks:

        a.   "American Sniper"

  b. "The Grand Budapest Hotel"

  c. "12 Years a Slave"

  d. "Dallas Buyers Club"

  e. "The Wolf of Wall Street"

  f. "American Hustle"

  g. "Les Misérables"

  h. "Silver Linings Playbook"

60. In December 2013, Meridian Cinemas showed the movie "The Wolf of Wall Street, which was nominated for an Academy Award for "Best Picture."

61. Upon information and belief, Government Defendants received an "anonymous tip" that Meridian Cinemas was showing the move.

62. Government Defendants contacted Meridian Cinemas and threatened enforcement of Idaho Code § 23-614, including revocation, suspension, or other action related to Meridian Cinemas' Liquor License.

63. After it received this threat, Meridian Cinemas ceased showing the movie "The Wolf of Wall Street" in auditoriums with VIP areas.

64. In January 2016, Meridian Cinemas planned to show the movie "The Revenant." Due to Government Defendants' threats and attempts to enforce Idaho Code § 23-614, Meridian Cinemas decided not to show "The Revenant" in auditoriums with VIP areas.

65. Upon information and belief, two other theaters in Idaho have liquor licenses.

66. Upon information and belief, these other theaters routinely show movies that portray acts or simulated acts of sexual intercourse or persons begins touched, caressed, or fondled on the breast or buttocks.

67.     Upon information and belief, Government Defendants have never revoked or attempted to revoke a theater's liquor license based on the prohibitions in Idaho Code § 23-614 for showing a movie rated PG-13 or R.

68.     As described in more detail below, Government Defendants have initiated an administrative proceeding to revoke Meridian Cinemas' Liquor License, under Idaho Code § 23-614, based on the content of the movie "50 Shades of Grey."

*50 Shades of Grey*

69.     The movie "50 Shades of Grey" is an adaptation of a book by author E.L. James.

70.     The book, together with two sequels, topped best-seller lists and has reportedly sold more than 100 million copies worldwide.

71.     The movie was also very popular, and reportedly set a box office record for the highest-grossing Presidents' Day holiday opener of all time.

72.     Upon information and belief, the movie has been shown in over 3,000 theaters nationwide, including almost every first-run mainstream theater in the State of Idaho.

73.     Upon information and belief, the movie "50 Shades of Grey" was shown locally at Treasure Valley area theaters including Majestic 18 (Meridian), Regal Gateway 12 (Nampa), Regal Spectrum 14 (Nampa), Regal 9 (Boise), Regal 21 (Boise) and many other Idaho theaters

74.     The movie received mixed reviews in publications such as the New York Times, the Wall Street Journal, and the Washington Post. See Exhibits 3-5.

75.     Like many other R-rated films, and some PG-13-rated films, "50 Shades of Grey" contains scenes in which the actors portray sexual intercourse or simulated sexual intercourse, and scenes that involve fondling of breasts or buttocks.

76.     Consistent with the movie's R rating and the comments of movie reviews, "50 Shades of Grey" is not pornographic, is not obscene, and no scene comes close to earning an

NC-17 designation. See Exhibit 5 at 2 (Washington Post review) ("[N]o scene comes close to

earning an NC-17 designation."); Exhibit 3 at 4 (New York Times Review) ("[The movie]

dabbles in romantic comedy and splashes around in melodrama, but the one thing it can't be –

the thing the novel so trashily and triumphantly is – is pornography."); Exhibit 4 at 2-3 (Wall

Street Journal review) ("The sex sequences are downright genteel compared to the grim

depersonalization of Bernando Bertolucci's 'Last Tango in Paris.'").

*Government Defendants' content-based attempt to revoke the License*

77.     Meridian Cinemas began showing the movie "50 Shades of Grey" on February

13, 2015. The movie ran for four weeks.

78.     Meridian Cinemas initially showed the move "50 Shades of Grey" in auditoriums

with VIP areas.

79.     Upon information and belief, as stated in the Second Amended Complaint,

Government Defendants received an anonymous tip that Meridian Cinemas was showing or was

going to show "50 Shades of Grey."

80.     On or about February 17, 2015, a detective with Idaho ABC, who was, upon

information and belief, acting under the command, supervision, or control of Government

Defendants, spoke with Meridian Cinemas and threatened enforcement of Idaho Code § 23-614.

81.     Based on this threat, Meridian Cinemas showed "50 Shades of Grey" only in

auditoriums with posted signs prohibiting the consumption of alcohol when the movie was being

shown.

82.     Upon information and belief, as stated in the Second Amended Complaint, on or

about February 26, 2015, Government Defendants sent undercover detectives to view the movie

"50 Shades of Grey" at Meridian Cinemas.

83.     Upon information and belief, as stated in the Second Amended Complaint, the undercover detectives, acting under the supervision and control of Government Defendants, ignored Meridian Cinemas' posted signs and employee instructions and consumed alcohol in an auditorium showing "50 Shades of Grey."

84.     On or about November 9, 2015, Government Defendants served a Complaint for Revocation of Retail Alcohol Beverage License that initiated an administrative proceeding to revoke Meridian Cinemas' Liquor License based on the showing of "50 Shades of Grey."

85.     Upon information and belief, Government Defendants directed or authorized the complaint to be served.

86.     On or about November 21, 2015, Government Defendants were, through an attorney representative, provided with *LSO, Ltd. v. Stroh*, 205 F.3d 1145 (9th Cir. 2000).  *See* Exhibit 6.

87.     Representatives of Meridian Cinemas and Government Defendants met on or about December 3, 2015 to discuss possible resolution of the administrative proceeding.

88.     The parties were unable to resolve the issue.

89.     On or about December 3, 2015, Government Defendants served an Amended Complaint for Revocation of Retail Alcohol Beverage License that continued to seek revocation of Meridian Cinemas' License based on "50 Shades of Grey." The Amended Complaint also sought suspension of Meridian Cinemas' License based on an alleged "Casino Night" at the facility, which involved raffles and prizes such a baseball caps and similarly low-value items.

90.     Upon information and belief, Government Defendants served or authorized the Amended Complaint to be served.

91.     On or about December 14, 2015, Meridian Cinemas sent Government Defendants, through an attorney representative, an email stating that the *LSO, Ltd.* case was on point and

prohibited enforcement of Idaho Code § 23-614 against Meridian Cinemas based on the content of "50 Shades of Grey."  *See* Exhibit 7.

92.    On December 21, 2015, Government Defendants served the Second Amended Complaint, which superseded the two complaints identified above and sought revocation of Meridian Cinemas' License based on the content of "50 Shades of Grey." On the same day, Government Defendants served a separate Complaint seeking to suspend Meridian Cinemas' License for the same alleged "Casino Night" discussed above.

93.    On or about December 28, 2015, Government Defendants, through an attorney representative, agreed to stay the administrative proceeding initiated by the Second Amended Complaint until the federal lawsuit initiated by this Verified Complaint is resolved.

94.    The Second Amended Complaint alleges that undercover detectives attended a showing of "50 Shades of Grey" at the Cinema, and that they consumed alcoholic beverages while watching the movie. Exhibit 1 at ¶¶24-38.

95.    The Second Amended Complaint contains seven counts alleging that the "showing of" certain acts "via film in a licensed premise is a violation of Idaho Code § 23-614." Exhibit 1 at ¶¶54, 56, 60, 64, 68, 72, 75.

96.    The Second Amended Complaint specifically describes the content of "50 Shades of Grey," and cites this content as the basis for attempting to revoke Meridian Cinemas' Liquor License. Exhibit 1 at ¶¶8-14.

97.    All seven counts are based on the showing of "50 Shades of Grey" on February 13, 14, 15, 16, 17, 18, and 26, respectively.

98.    The Second Amended Complaint seeks revocation of Meridian Cinemas' retail alcohol beverage license, imposition of the Government's attorney fees, and such other relief as deemed just and proper. Exhibit 1 at 17, ¶¶1-3.

99.     The Second Amended Complaint is not based on any behavior, or complaints of behavior, other than showing the movie "50 Shades of Grey" in a licensed premise in which alcohol was served. *See* Exhibit 1.

100.     Upon information and belief, Government Defendants decided to take punitive action against Meridian Cinemas, including attempting to revoke Meridian Cinemas' Liquor License in the Second Amended Complaint, based on the content of the movie "50 Shades of Grey."

*Meridian Cinemas' damages*

101.     Government Defendants' actions in threatening to enforce Idaho Code § 23-614 against Meridian Cinemas, including the threat to revoke Meridian Cinemas' Liquor License in the Second Amended Complaint, has damaged Meridian Cinemas.

102.     In response to Government Defendants' threats to enforce Idaho Code § 23-614, the breadth of Idaho Code § 23-614, and the uncertainty regarding what movies will trigger enforcement of Idaho Code § 23-614, Meridian Cinemas has been forced to screen movies before showing them, in an attempt to determine whether the movie will trigger enforcement of the statute.

103.     This practice is expensive and time-consuming, without any assurance that Meridian Cinemas' opinion as to the content of each movie would be the same as Government Defendants' opinion.

104.     In response to Government Defendants' threats to enforce Idaho Code § 23-614, including the threat to revoke Meridian Cinemas' Liquor License, the breadth of Idaho Code § 23-614, and the uncertainty regarding what movies will trigger enforcement of Idaho Code § 23-614, Meridian Cinemas has chosen not to show certain movies that contain content identified in Idaho Code § 23-614.

105.    Instead, Meridian Cinemas has decided to show movies that do not contain content identified in Idaho Code § 23-614, or movies that contain less content identified in the statute.

106.    This has restricted and chilled Meridian Cinemas' right to determine what movies it will show.

107.    This has also resulted in the sale of fewer tickets and other products.

108.    In response to Government Defendants' threats to enforce Idaho Code § 23-614, including the threats contained in the Second Amended Complaint, Meridian Cinemas has shown movies, including "The Wolf of Wall Street," "The Revenant" and "50 Shades of Grey," in smaller auditoriums without VIP areas, or with posted signs prohibiting consumption of alcohol during those movies.

109.    This caused decreased sales of tickets and other products for these movies.

110.    In response to Government Defendants' threats to enforce Idaho Code § 23-614, including the threat to revoke Meridian Cinemas' Liquor License, Meridian Cinemas has taken steps to prohibit consumption of alcohol in its auditoriums, including posting signs outside auditoriums, instructing staff to inform patrons that they cannot consume alcohol in the auditoriums, and other actions that detract from the patrons' experience in the auditorium.

111.    This caused decreased sales of tickets and other products.

112.    So long as there is a realistic chance that Government Defendants or their successors will enforce Idaho Code § 23-614, Meridian Cinemas will be forced to choose which movies to show based, in part, on whether those movies contain content identified in the statute.

113.    So long as there is a realistic chance that Government Defendants or their successors will enforce Idaho Code § 63-614, Meridian Cinemas will be forced to choose which

movies to show based, in part, on its assessment of whether the content of those movies will trigger enforcement of the statute.

114.    So long as there is a realistic chance that Government Defendants or their successors will enforce Idaho Code § 23-614, Meridian Cinemas will be forced to show certain movies in smaller auditoriums without VIP areas, based on the content of those movies.

115.    So long as there is a realistic chance that Government Defendants or their successors will enforce Idaho Code § 23-614, Meridian Cinemas will continue to suffer the damages identified in this Verified Complaint.

116.    These damages are ongoing, and will continue until there is no longer a realistic chance that Government Defendants or their successors will enforce Idaho Code § 23-614.

**CLAIMS FOR RELIEF**
**COUNT ONE**
(Violation of First Amendment, declaratory relief)

117.    Meridian Cinemas incorporates all allegations in this Verified Complaint as if set forth in full.

118.    Meridian Cinemas asserts this claim against Government Defendants in their official and individual capacities.

119.    42 U.S.C. § 1983 provides a cause of action for Meridian Cinemas to hold Government Defendants liable for violation of the First Amendment.

120.    Government Defendants' actions deprived Meridian Cinemas of its rights, privileges, and immunities under the First Amendment.

121.    Government Defendants' actions and were taken under the color of state law, specifically Idaho Code § 23-614 and any other statute or rule identified in the Second Amended Complaint.

122.    Under 28 U.S.C. § 2201, this Court has the authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

123.    The movie "50 Shades of Grey," other movies rated PG-13 and R, and the decisions to show such movies are protected by the First Amendment.

124.    The First Amendment, and case law interpreting the First Amendment, including *LSO, Ltd.*, prohibits the government from punishing or threatening to punish speech protected by the First Amendment, including by revoking or threatening to revoke a facility's liquor license.

125.    Government Defendants' actions in threatening to revoke Meridian Cinemas' Liquor License based on the content of non-obscene movies, including the threat contained in the Second Amended Complaint, violate the First Amendment.

126.    Meridian Cinemas is entitled to a declaration that the Government Defendants' conduct identified in this Verified Complaint violates the First Amendment.

127.    Meridian Cinemas is entitled to a declaration that past and future enforcement, threatened enforcement, or other action under Idaho Code § 23-614 against Meridian Cinemas based on the content of a non-obscene movie violates the First Amendment.

## COUNT TWO
(Violation of First Amendment, injunctive relief)

128.    Meridian Cinemas incorporates all the allegations in this Verified Complaint as if set forth in full.

129.    Meridian Cinemas asserts this claim against Government Defendants in their official and individual capacities.

130.    42 U.S.C. § 1983 provides a cause of action for Meridian Cinemas to enjoin Government Defendants for violating of the First Amendment.

131.    Government Defendants' actions deprived, and continue to deprive, Meridian Cinemas of its rights, privileges, and immunities under the First Amendment.

132.    Government Defendants' actions have chilled Meridian Cinemas' exercise of its First Amendment rights to decide which movies to show, free from threats of punishment by Government Defendants.

133.    Government Defendants' actions were taken under the color of state law, specifically Idaho Code § 23-614 and any other statute or rule identified in the Second Amended Complaint.

134.    The movie "50 Shades of Grey," other movies rated PG-13 and R, and the decisions to show such movies are expressions protected by the First Amendment.

135.    The First Amendment and case law interpreting the First Amendment, including *LSO, Ltd.*, prohibit the government from punishing or threatening to punish constitutionally protected speech, including by revoking or threatening to revoke a facility's liquor license.

136.    Government Defendants' actions in threatening to revoke Meridian Cinemas' Liquor License, including the threats contained in the Second Amended Complaint, violate the First Amendment.

137.    Consistent with its First Amendment rights, Meridian Cinemas intends to continue to show non-obscene, R and PG-13 rated movies, including movies that may contain depictions identified in Idaho Code § 23-614.

138.    As set forth in this Verified Complaint, Government Defendants' unlawful actions have irreparably harmed Meridian Cinemas by forcing it to choose which movies to show based on the content of those movies.

139.    As set forth in this Verified Complaint, Government Defendants' unlawful actions will continue to irreparably harm Meridian Cinemas by, among other things, chilling Meridian

Cinemas' free speech by forcing Meridian Cinemas to choose which movies to show in its auditoriums based on the content of those movies, and without knowing which movies may trigger enforcement of Idaho Code § 23-614.

140.     Meridian Cinemas' remedies at law are not adequate to remedy its past and ongoing injuries.

141.     Although Government Defendants have agreed to stay the administrative proceeding initiated by the Second Amended Complaint for the duration of this lawsuit, Government Defendants have continued to threaten to enforce Idaho Code § 23-614 based on the content of movies.

142.     Injunctive relief against Government Defendants will not cause hardship; it will simply ensure protection of Meridian Cinemas' right to be free from governmental punishment based on expression protected by the First Amendment.

143.     The public interest would not be disserved by injunctive relief, as the public will be able to view movies that were chosen without regard to threat of punishment from Government Defendants based on the content of those movies.

144.     Meridian Cinemas is entitled to preliminary and injunctive relief prohibiting Government Defendants from enforcing or threatening to enforce Idaho Code § 23-614 based on showing non-obscene movies.

**COUNT THREE**
(Violation of First Amendment, damages)

145.     Meridian Cinemas incorporates all the allegations in this Verified Complaint as if set forth in full.

146.     Meridian Cinemas asserts this claim against Government Defendants in their individual capacities.

147.    42 U.S.C. § 1983 provides a cause of action for Meridian Cinemas to hold Government Defendants liable for violation of the First Amendment.

148.    Government Defendants' actions deprived Meridian Cinemas of its rights, privileges, and immunities under the First Amendment.

149.    Government Defendants' actions were taken under the color of state law, specifically Idaho Code § 23-614 and any other statute or rule identified in the Second Amended Complaint.

150.    The movie "50 Shades of Grey," other movies rated PG-13 and R, and the decisions to show such movies are expressions protected by the First Amendment.

151.    The First Amendment, and caselaw interpreting the First Amendment, including *LSO, Ltd.*, prohibit the government from punishing or threatening to punish speech protected by the First Amendment, including by revoking or threatening to revoke a facility's liquor license.

152.    As set forth in this Verified Complaint, Government Defendants had actual or constructive knowledge that their conduct violated the First Amendment, based in part on the fact that Government Defendants were provided with *LSO, Ltd.* and were given the opportunity to withdraw the administrative proceeding to revoke Meridian Cinemas' Liquor License.

153.    Government Defendants refused to withdraw the administrative proceeding, and instead insisted upon continuing the attempt to revoke Meridian Cinemas' Liquor License based on showing "50 Shades of Grey."

154.    Government Defendants' actions in threatening to revoke Meridian Cinemas' Liquor License, including in the Second Amended Complaint, violate the First Amendment.

155.    As set forth in this Verified Complaint, Government Defendants' unlawful conduct has damaged Meridian Cinemas.

156.    Meridian Cinemas is entitled to an award of monetary damages to redress its injuries.

157.    As set forth in this Verified Complaint, Government Defendants have attempted to revoke Meridian Cinemas' Liquor License despite the fact that, as of 2000, no reasonable official could believe that Idaho Code § 23-614 could be used to restrict or punish speech based on the content of "50 Shades of Grey."

158.    As set forth in this Verified Complaint, Government Defendants have attempted to revoke Meridian Cinemas' Liquor License despite the fact that, as of 2000, no reasonable official could have believed that Idaho Code § 23-614 could constitutionally be employed to impede Meridian Cinema's right to display, or to punish the display of, "50 Shades of Grey" based on the content of the movie.

159.    Government Defendants' decision to revoke Meridian Cinemas' Liquor License notwithstanding knowledge of the unconstitutional nature of this action constitutes deliberate, reckless, or callous indifference to Meridian Cinemas' federally protected rights.

160.    Meridian Cinemas is, therefore, entitled to an award of monetary damages against Government Defendants in their individual capacities, in an amount to be proven at trial.

## ATTORNEY FEES AND COSTS

Meridian Cinemas has been required to retain the services of a law firm to bring this lawsuit. Meridian Cinemas is entitled to an award of costs, expert witness fees, and reasonable attorney fees under 42 U.S.C. § 1988, Federal Rule of Civil Procedure 54, and any other applicable law, contract, or rule.

## DEMAND FOR JURY TRIAL

Meridian Cinemas requests a trial by jury on all issues for which a jury trial is available by law, and does not stipulate to a six-person jury or a jury consisting of less than twelve persons.

**PRAYERS FOR RELIEF**

Meridian Cinemas prays that the Court enter judgment and any necessary orders against the Defendants affording the following relief:

1.      An order declaring that Government Defendants' past and future enforcement, and threatened enforcement, of Idaho Code § 23-614 against Meridian Cinemas for showing non-obscene movies, including the movie "50 Shades of Grey," violates the First Amendment to the United States Constitution.

2.      An order granting preliminary and permanent injunctive relief prohibiting Government Defendants from enforcing, threatening to enforce, or otherwise taking action against Meridian Cinemas or its Liquor License pursuant to Idaho Code § 23-614 for showing non-obscene movies, including the movie "50 Shades of Gray."

3.      An order prohibiting Government Defendants from revoking Meridian Cinemas' Liquor License in the administrative proceeding initiated by the Second Amended Complaint, and requiring Government Defendants to dismiss or otherwise terminate the administrative proceeding initiated by the Second Amended Complaint.

4.      An order awarding monetary damages against Government Defendants in their individual capacities, in an amount to be proven at trial.

5.      An order awarding Meridian Cinemas its costs, expert witness fees, and reasonable attorney fees incurred in this proceeding.

6.      Any other relief the Court deems just and proper.

DATED this 19th day of January 2016.

GIVENS PURSLEY LLP

By:____/s/ Jeremy C. Chou____
          Jeremy C. Chou
          *Attorneys for Meridian Cinemas, LLC*

## VERIFICATION

I, David Corkill, am a Managing Member of Meridian Cinemas, LLC. I have read the Verified Complaint and Demand for Jury Trial ("Verified Complaint") and exhibits. The facts set forth in the Verified Complaint are true to the best of my knowledge, information, and belief. I have authority to verify these facts on behalf of the plaintiff, Meridian Cinemas, LLC.

I declare under penalty of perjury that the foregoing is true and correct.

By:_____
David Corkill
Managing Member, Meridian Cinemas, LLC

# EXHIBIT 1

LAWRENCE G. WASDEN
Attorney General

STEPHANIE A. ALTIG
Lead Deputy Attorney General

KENNETH M. ROBINS
Deputy Attorney General
Idaho State Police
Idaho State Bar No. 4196
700 S. Stratford Drive
Meridian, Idaho 83642
Telephone:    (208) 884-7050
Facsimile:    (208) 884-7228

Attorney for the Complainant

## A CONTESTED MATTER BEFORE THE DIRECTOR

## OF THE IDAHO STATE POLICE

| | |
|---|---|
| IDAHO STATE POLICE,<br>ALCOHOL BEVERAGE CONTROL,<br><br>Complainant,<br><br>vs.<br><br>MERIDIAN CINEMAS LLC, DAVID J.<br>CORKILL (Managing Partner), and MARK<br>C. CUNNINGHAM (Member), dba<br>VILLAGE CINEMA & BACKSTAGE<br>BISTRO,<br><br>Respondents. | ) Case No. 15ABC026<br>) License No. 15309<br>) Premise No. 1A-15309<br>)<br>)<br>)<br>) **SECOND AMENDED COMPLAINT**<br>) **FOR REVOCATION OF RETAIL**<br>) **ALCOHOL BEVERAGE LICENSE**<br>)<br>)<br>)<br>) |

Complainant by and through its attorney, Kenneth M. Robins, Deputy Attorney General,

hereby alleges and asserts its causes of action as follows:

## I. AUTHORITY.

1.     This is an administrative action brought against Respondents, dba Village Cinema

& Backstage Bistro, pursuant to the provisions of Title 67, Chapter 52, of the Idaho Code.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 1*

2.     Complainant is the Idaho State Police, Bureau of Alcohol Beverage Control (hereinafter "ABC").

3.     ABC has the authority to promulgate rules and regulations necessary to carry out the provisions of the Idaho Code, Title 23, Chapter 6, pursuant to IDAHO CODE §§ 67-2901, 23-932, 23-946(b), 23-1330, and 23-1408.

4.     ABC is the state entity charged under the Idaho Code, Title 23, Chapters 8, 9, 10 and 13, with the authority to enforce and police the Idaho Liquor Act, pursuant to IDAHO CODE § 23-804.

5.     IDAHO CODE §§ 23-614, 23-933, 23-1037, and 23-1331 provide the basis and authority for this Complaint.

6.     During all times relevant to this Second Amended Complaint and to the present, Respondents have been licensed to sell and serve liquor by the drink, beer, and wine by the bottle and by the drink pursuant to IDAHO CODE §§ 23-903, 23-1010, and 23-1306, respectively.  The licensed premises are located at 3711 E. Longwing Lane, Meridian, Ada County, Idaho.

## II. ALLEGATIONS.

7.     On February 13, 2015, ABC received an anonymous telephone call issuing a complaint that Respondents were playing the movie "50 Shades of Grey" at the licensed premises.  The movie opened at the licensed premises that same day.

8.     During one scene which lasted approximately three (3) minutes, the film "50 Shades of Grey" depicted a male character and a female character engaging in prohibited sex acts and/or simulated sex acts together:

        a.     In this scene, the male and female both removed all their
               clothing and were completely naked.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF
RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)
Page 2*

b.   The male rubbed the female's naked body with his hands. At least once, the male touched and/or caressed the female's bare breasts with his hands.

c.   The male and female engaged in actual or simulated sexual intercourse for approximately forty (40) seconds.

9.   Another scene in the film "50 Shades of Grey" which lasted less than one (1) minute showed the same male and female together. Both were completely naked. They entered a bath tub together, and the male touched and/or caressed the female's bare breasts while they lay in the bath tub.

10.   During another scene, which lasted approximately two (2) to two and a half (2.5) minutes, the film "50 Shades of Grey" depicted the same male and female together engaging in multiple prohibited sex acts and/or simulated sex acts:

a.   The male restrained the female by tying her hands to a bed, and the male also blindfolded the female. The female was completely naked. This was apparent because the film showed the female's breasts multiple times and then showed her completely naked, hiding only her genitals from view.

b.   With the female on her back, the male placed an ice cube in his mouth and began to touch and/or caress the female's body, including her bare breasts, with the ice cube and his mouth.

c.   The male flipped the female over onto her front and slapped her bare buttocks, appearing sexually aroused by his conduct. The male then placed the female character on all fours, took off his pants behind her, and engaged in actual or simulated sexual intercourse with her.

11.   Another scene in the film "50 Shades of Grey" which lasted approximately one (1) minute showed the male take the female into a room to flagellate her:

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 3*

      a.      The male sat on a couch and bent the female over on his lap.

      b.      The male lifted the female's skirt up onto her back and pulled her panties down below her buttocks.

      c.      The male slapped the female's bare buttocks multiple times and appeared sexually stimulated by his conduct.

12.     During another scene which lasted approximately six (6) to seven (7) minutes, the film "50 Shades of Grey" portrayed the same male and female together, and the two engaged in more prohibited sex acts and/or simulated sex acts throughout the scene:

      a.      The female was completely naked for most of the scene. The male employed restraints on the female to accomplish multiple sex acts and/or simulated sex acts.

      b.      With the female restrained by the wrists and hoisted standing up, the male touched and/or caressed the female on her bare breasts and buttocks with his hands.

      c.      The male also restrained the female by the wrists in a bent over position, and he slapped the female on her bare buttocks multiple times with his hands, appearing sexually stimulated by his conduct.

      d.      The male unzipped his pants, exposing to view his pubic hair and the base of his penis.

      e.      The male engaged in actual or simulated sexual intercourse with the female. The film clearly showed the male and female were both completely naked.

13.     During a scene which lasted approximately two (2) minutes, the female was completely naked, and the male performed multiple prohibited sex acts or simulated sex acts with her:

      a.      The male used a type of whip to touch and/or caress the female's naked body. At least once, the male used the whip to touch and/or caress the female's bare breasts.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 4*

    b.     The male also whipped the female's naked body with the whip and appeared sexually aroused by his conduct.

    c.     Towards the end of the scene, and with the female lying on her back completely naked, the male performed actual or simulated oral copulation on the female who acted sexually stimulated by the conduct. The male positioned himself between the female's legs with his face close enough to the female's genitals that viewers could not see his face below his nose.

14.    One of the final scenes of the film lasted approximately two (2) minutes, and during this scene the male stripped the female down so that she was completely naked and proceeded to severely flagellate her:

    a.     The male bent the naked female over onto a table and told her he was going to strike her six (6) times. The male ordered her to count out loud with each blow.

    b.     The male proceeded to whip the female on her bare buttocks six (6) times with a belt while the female lay bent over on the table.

    c.     The female cried, and the male acted sexually stimulated by his conduct.

15.    ABC Detective Tyler Jussel began an investigation on February 13, 2015, by calling the Village Cinema & Backstage Bistro directly. Det. Jussel spoke with a female manager named April during this telephone call.

16.    Det. Jussel learned that employees at the licensed premises were serving alcoholic beverages to patrons at the licensed premises inside the auditoriums showing the film "50 Shades of Grey," and patrons were consuming the alcohol while viewing that film.

17.    Later on February 13, 2015, Det. Jussel received a telephone call from a male manager at the licensed premises. Det. Jussel advised the manager of the complaint against the Village Cinema & Backstage Bistro and the need to comply with IDAHO CODE § 23-614.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 5*

18.     On February 17, 2015, Det. Jussel spoke with Respondent David J. Corkill via telephone about the complaint against Respondents concerning potential violations of IDAHO CODE § 23-614, which makes certain conduct unlawful in licensed premises.  Mr. Corkill explained that employees at the licensed premises would cease serving alcohol in auditoriums showing "50 Shades of Grey" the next day, February 18, 2015.

19.     On February 19, 2015, Lt. Russell Wheatley,[1] ABC Bureau Chief, also spoke with Mr. Corkill about the "50 Shades of Grey" film and IDAHO CODE § 23-614.  During this conversation, Mr. Corkill admitted to Lt. Wheatley that the Village Cinema & Backstage Bistro had likely shown several other movies in potential violation of IDAHO CODE § 23-614.

20.     Respondents never lacked information about the potential for violations of IDAHO CODE § 23-614 and the ramifications of such violations.

21.     In June 2013, Lt. Wheatley spoke with Mr. Corkill before the construction of the licensed premises in Meridian, Idaho.  Lt. Wheatley explained and discussed the potential problems presented by a movie theater having a liquor license because of the distinct probability that certain films contain content which violates IDAHO CODE § 23-614.

22.     ABC representatives visited the licensed premises multiple times during construction.  These representatives received tours of the premises and discussed various issues regarding it.  During one such visit, the ABC representatives provided copies of IDAHO CODE § 23-614 to those who participated in the tour of the premises for information and discussion.

23.     Also, prior to the Village Cinema & Backstage Bistro opening for business, ABC hosted a conference at the Idaho State Police headquarters with representatives for Respondents

---

[1] Since this time, Lt. Russell Wheatley has been promoted to the rank of Captain.

and ABC.  Both parties had their attorneys present, and they discussed the possible challenges which Respondents faced under IDAHO CODE § 23-614.

24.    On February 26, 2015, Det. Jussel and ABC Detective Gabriel Coleman attended a showing of the "50 Shades of Grey" film at the licensed premises.

25.    Inside the licensed premises, signs were posted which read:  "Idaho law restricts us from serving alcohol or allowing its consumption in auditoriums showing "50 Shades of Grey."  However, alcohol consumption is permitted in our Bistro and VIP bar areas."

26.    The ABC Detectives arrived approximately forty (40) minutes prior to their showing of "50 Shades of Grey," which was scheduled to begin at 7:00 p.m.

27.    The Detectives had tickets for the "VIP Section" of the auditorium.  The VIP Sections in each auditorium are sections of seating on the second floor which are licensed for serving and consuming alcoholic beverages.

28.    The Detectives took their seats in the VIP Section of the auditorium, and a female employee identified as Kayla Moss attended them.

29.    Det. Jussel and Det. Coleman ordered a Blue Moon beer and a Bacardi Rum with Diet Coke mixed drink, and Ms. Moss served them these alcoholic beverages inside the auditorium prior to the showing of "50 Shades of Grey."

30.    Movie previews began at approximately 7:00 p.m., and the film "50 Shades of Grey" began at approximately 7:10 p.m.

31.    Det. Jussel and Det. Coleman still had the two alcoholic beverages they purchased through Ms. Moss and continued to consume them in the auditorium after the film began.  At approximately 7:16 p.m., the Detectives paid for these alcoholic beverages while continuing to watch "50 Shades of Grey."  Ms. Moss provided them with a receipt.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 7*

32.    At no time did Ms. Moss tell the Detectives of any policy against drinking alcohol in auditoriums showing "50 Shades of Grey," and she continued to allow the Detectives to consume their alcoholic beverages while the film played on the screen.

33.    No other employees took any action regarding these two alcoholic beverages or spoke to the Detectives about any alcohol policy in reference to those particular beverages.

34.    During the showing of "50 Shades of Grey," Det. Jussel left the auditorium to visit the bar just outside the auditorium in the hallway and order another alcoholic beverage. Det. Jussel ordered another Blue Moon beer from a female employee identified as Magdalene Sutton.  Ms. Sutton asked Det. Jussel which movie he was seeing, and Det. Jussel told her he was watching "50 Shades of Grey."

35.    Ms. Sutton informed Det. Jussel that no alcohol was permitted in viewings of "50 Shades of Grey" and explained that he would have to consume this alcoholic beverage in the hallway before going back into the auditorium.  Ms. Sutton did not say anything about the two alcoholic beverages still inside the auditorium showing "50 Shades of Grey" or ask whether Det. Jussel had any other alcoholic beverages inside the auditorium.

36.    Det. Jussel later took the Blue Moon beer he purchased from Ms. Sutton back into the auditorium.  Ms. Sutton followed and again explained the policy against alcohol being consumed in showings of "50 Shades of Grey."

37.    The Detectives again took the same alcoholic beverage into the auditorium. Approximately ten (10) to fifteen (15) minutes later, another female employee followed and informed the Detectives of the alcohol policy.  This employee then left without further action, leaving the Detectives with alcoholic beverages in the auditorium showing "50 Shades of Grey."

38.     A male employee identified as Brendon Lamay later arrived, asked to speak to the Detectives in the hallway about the alcohol policy, and escorted them out of the auditorium.

39.     On July 28, 2015, Det. Jussel spoke with multiple employees of the Village Cinema & Backstage Bistro, including Zachary Reece, Shelby Lee, Tara Mauk, and Kayla Moss.

40.     Zachary Reece told Det. Jussel that he worked at the licensed premises and that he served alcoholic beverages as part of his job. Mr. Reece confirmed to Det. Jussel that alcohol was served to and consumed by patrons in auditoriums showing "50 Shades of Grey" until sometime after ABC notified Respondents of the violation of IDAHO CODE § 23-614. Mr. Reece said typically 95% of patrons seated in the VIP Sections consume alcohol.

41.     Mr. Reece also stated that servers typically do not go into the auditorium during movie showings to serve alcohol.

42.     Shelby Lee told Det. Jussel she worked in the licensed premises during showings of "50 Shades of Grey" as a food runner. She said typically a lot of customers consume alcohol in the theater auditoriums. She stated that alcohol service did occur for a time in auditoriums showing "50 Shades of Grey" but later stopped. A "no alcohol" policy was then strictly enforced for those auditoriums.

43.     Tara Mauk told Det. Jussel she is the lead server and an employee trainer at the licensed premises. She works in the VIP Sections and worked there as a server when "50 Shades of Grey" was showing. She confirmed that alcohol was served and consumed in auditoriums showing "50 Shades of Grey" for the first few showings—at least for three (3) nights. However, alcohol service stopped after management directed employees not to allow alcohol into those auditoriums.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 9*

44.     Ms. Mauk stated this policy for "50 Shades of Grey" was the first time she had ever heard about alcohol not being allowed during certain movie showings because of content.

45.     Kayla Moss was the female server who served Det. Jussel and Det. Coleman on February 26, 2015, when the Detectives attended a showing of "50 Shades of Grey" at the licensed premises in the VIP Section of an auditorium (see Allegations No. 18-22). However, when speaking with Det. Jussel on July 28, 2015, Ms. Moss claimed she could not remember whether alcohol was served during any showings of "50 Shades of Grey" or whether she served alcohol during those showings. Ms. Moss no longer worked for Respondents at the time of this conversation.

46.     Det. Jussel spoke with another Village Cinema & Backstage Bistro employee named Kevin Maxwell on August 3, 2015. Mr. Maxwell was also no longer an employee at the licensed premises as of that date, but during the time he worked there, he worked as a server in both the Backstage Bistro and in the VIP Sections in the theater auditoriums. From his recollection, employees at the licensed premises served alcohol in auditoriums showing "50 Shades of Grey" at some point, but this later stopped.

47.     All these employees, other than Ms. Moss, indicated that alcohol consumption is a big part of the business in the VIP Sections at the licensed premises.

48.     On September 1, 2015, Det. Jussel and Det. Coleman visited the licensed premises and spoke with Misti Rex, the manager over the alcohol service areas in the licensed premises. She confirmed that alcoholic beverages are typically permitted in the VIP Sections of the auditoriums as those are included in the licensed premises.

49.     Ms. Rex also confirmed that alcohol service occurred in auditoriums showing "50 Shades of Grey." However, she claimed that the management ended this practice for showings

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 10*

of "50 Shades of Grey" and that the restrictive signs mentioned in Allegation No. 17 were then posted.

### III. CAUSES OF ACTION.

### COUNT I
#### Conducting, Permitting, and/or Encouraging the Showing of a Film Depicting Acts or Simulated Acts of Prohibited Sexual Conduct on February 13, 2015
#### IDAHO CODE § 23-614(1)(e)

50.   Complainant restates and realleges paragraphs 1 through 49 and incorporates them by reference herein.

51.   On February 13, 2015, Respondents played the film "50 Shades of Grey" in select auditoriums at the licensed premises. Employees served alcoholic beverages to patrons attending the showings of this film. Patrons then consumed these alcoholic beverages inside the auditoriums while they watched the film.

52.   As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50 Shades of Grey" is a film which depicts several acts of sexual conduct including a female being touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual intercourse, oral copulation, and flagellation. The showing of these acts via film in a licensed premise is a violation of IDAHO CODE § 23-614.

53.   Regardless of whether Respondents were present at the licensed premises on February 13, 2015, when the above-referenced violation occurred, any violation of the provisions of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

### COUNT II
#### Conducting, Permitting, and Encouraging the Showing of a Film Depicting Acts or Simulated Acts of Prohibited Sexual Conduct in a Licensed Premise on February 14, 2015
#### IDAHO CODE § 23-614(1)(e)

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 11*

54.    Complainant restates and realleges paragraphs 1 through 49 and incorporates them by reference herein.

55.    On February 14, 2015, Respondents played the film "50 Shades of Grey" in select auditoriums at the licensed premises.  Employees served alcoholic beverages to patrons attending the showings of this film.  Patrons then consumed these alcoholic beverages inside the auditoriums while they watched the film.

56.    As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50 Shades of Grey" is a film which depicts several acts of sexual conduct including a female being touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual intercourse, oral copulation, and flagellation.  The showing of these acts via film in a licensed premise is a violation of IDAHO CODE § 23-614.

57.    Regardless of whether Respondents were present at the licensed premises on February 14, 2015, when the above-referenced violation occurred, any violation of the provisions of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

### COUNT III
### Conducting, Permitting, and Encouraging the Showing of a Film Depicting Acts or Simulated Acts of Prohibited Sexual Conduct in a Licensed Premise on February 15, 2015
### IDAHO CODE § 23-614(1)(e)

58.    Complainant restates and realleges paragraphs 1 through 49 and incorporates them by reference herein.

59.    On February 15, 2015, Respondents played the film "50 Shades of Grey" in select auditoriums at the licensed premises.  Employees served alcoholic beverages to patrons attending

the showings of this film. Patrons then consumed these alcoholic beverages inside the

auditoriums while they watched the film.

60.     As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50

Shades of Grey" is a film which depicts several acts of sexual conduct including a female being

touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual

intercourse, oral copulation, and flagellation. The showing of these acts via film in a licensed

premise is a violation of IDAHO CODE § 23-614.

61.     Regardless of whether Respondents were present at the licensed premises on

February 15, 2015, when the above-referenced violation occurred, any violation of the provisions

of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting

on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

### COUNT IV
**Conducting, Permitting, and Encouraging the Showing of a Film Depicting Acts or**
**Simulated Acts of Prohibited Sexual Conduct in a Licensed Premise on February 16, 2015**
**IDAHO CODE § 23-614(1)(e)**

62.     Complainant restates and realleges paragraphs 1 through 49 and incorporates

them by reference herein.

63.     On February 16, 2015, Respondents played the film "50 Shades of Grey" in select

auditoriums at the licensed premises. Employees served alcoholic beverages to patrons attending

the showings of this film. Patrons then consumed these alcoholic beverages inside the

auditoriums while they watched the film.

64.     As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50

Shades of Grey" is a film which depicts several acts of sexual conduct including a female being

touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 13*

intercourse, oral copulation, and flagellation.  The showing of these acts via film in a licensed

premise is a violation of IDAHO CODE § 23-614.

65.     Regardless of whether Respondents were present at the licensed premises on

February 16, 2015, when the above-referenced violation occurred, any violation of the provisions

of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting

on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

## COUNT V
### Conducting, Permitting, and Encouraging the Showing of a Film Depicting Acts or Simulated Acts of Prohibited Sexual Conduct in a Licensed Premise on February 17, 2015 IDAHO CODE § 23-614(1)(e)

66.     Complainant restates and realleges paragraphs 1 through 49 and incorporates

them by reference herein.

67.     On February 17, 2015, Respondents played the film "50 Shades of Grey" in select

auditoriums at the licensed premises.  Employees served alcoholic beverages to patrons attending

the showings of this film.  Patrons then consumed these alcoholic beverages inside the

auditoriums while they watched the film.

68.     As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50

Shades of Grey" is a film which depicts several acts of sexual conduct including a female being

touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual

intercourse, oral copulation, and flagellation.  The showing of these acts via film in a licensed

premise is a violation of IDAHO CODE § 23-614.

69.     Regardless of whether Respondents were present at the licensed premises on

February 17, 2015, when the above-referenced violation occurred, any violation of the provisions

of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting

on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

## COUNT VI
### Conducting, Permitting, and Encouraging the Showing of a Film Depicting Acts or Simulated Acts of Prohibited Sexual Conduct in a Licensed Premise on February 18, 2015
### IDAHO CODE § 23-614(1)(e)

70.     Complainant restates and realleges paragraphs 1 through 49 and incorporates

them by reference herein.

71.     On February 18, 2015, Respondents played the film "50 Shades of Grey" in select

auditoriums at the licensed premises.  Employees served alcoholic beverages to patrons attending

the showings of this film.  Patrons then consumed these alcoholic beverages inside the

auditoriums while they watched the film.

72.     As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50

Shades of Grey" is a film which depicts several acts of sexual conduct including a female being

touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual

intercourse, oral copulation, and flagellation.  The showing of these acts via film in a licensed

premise is a violation of IDAHO CODE § 23-614.

73.     Regardless of whether Respondents were present at the licensed premises on

February 18, 2015, when the above-referenced violation occurred, any violation of the provisions

of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting

on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

## COUNT VII
### Conducting, Permitting, and Encouraging the Showing of a Film Depicting Acts or Simulated Acts of Prohibited Sexual Conduct in a Licensed Premise on February 26, 2015
### IDAHO CODE § 23-614(1)(e)

74.     Complainant restates and realleges paragraphs 1 through 49 and incorporates them by reference herein.

75.     On February 26, 2015, Respondents showed the film "50 Shades of Grey" in select auditoriums at the licensed premises.  As described in paragraphs 10, 11, 12, 13 and 14 of this complaint, the film "50 Shades of Grey" is a film which depicts several acts of sexual conduct including a female being touched and/or caressed on her bare breasts and buttocks and acts and/or simulated acts of sexual intercourse, oral copulation, and flagellation.  The showing of these acts via film in a licensed premise is a violation of IDAHO CODE § 23-614.

76.     An employee at the licensed premises served two alcoholic beverages to Det. Jussel and Det. Coleman, who were attending a showing of "50 Shades of Grey," inside one such auditorium in the VIP Section.  Det. Jussel and Det. Coleman possessed and consumed these alcoholic beverages inside the auditorium after the film began, and they continued to do so while they watched the film.  The Detectives paid for their alcoholic beverages and received a receipt, all while continuing to watch the film and consume alcohol.

77.     At no time did any employee tell the Detectives that they must take these alcoholic beverages out of the auditorium during the film's showing.  Only when Det. Jussel attempted to purchase another alcoholic beverage outside the auditorium and then take it inside the auditorium was an alcohol policy enforced.

78. Regardless of whether Respondents were present at the licensed premises on February 26, 2015, when the above-referenced violation occurred, any violation of the provisions of the Idaho Code, Title 23, by any agent, employee, servant, or other person in any way acting on behalf of a licensee shall be a violation by the licensee under IDAHO CODE § 23-935.

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 16*

## IV. RESPONDENTS' RESPONSE.

Failure to file a response to this Complaint within twenty-one (21) days will subject the Respondents to default, pursuant to IDAPA 04.11.01.270.

## V.  COMPLAINANT'S PRAYER FOR RELIEF.

WHEREFORE, Complainant prays for relief as follows:

1.   Revocation of Respondents' retail alcohol beverage license, pursuant to IDAHO CODE §§ 23-933, 23-1037, and 23-1331.

2.   Costs and reasonable attorney fees, pursuant to IDAHO CODE § 12-117.

3.   Such other relief as deemed just and proper.

DATED this 21 st day of December, 2015.

OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF IDAHO


KENNETH M. ROBINS
DEPUTY ATTORNEY GENERAL

*SECOND AMENDED COMPLAINT FOR REVOCATION OF
RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)
Page 17*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing SECOND AMENDED COMPLAINT FOR REVOCATION OF RETAIL ALCOHOL BEVERAGE LICENSE was served on the following on this _213t_ day of December, 2015, by the following method:

Jeremy Chou
Attorney at Law
Givens Pursley LLP
601 W. Bannock Street
Boise, Idaho 83702

[ ] U.S. First Class Mail, Postage Prepaid
[✓] U.S. Certified Mail, Postage Prepaid
[ ] Federal Express
[ ] Hand Delivery
[ ] Facsimile
[✓] Electronic Mail

Cpt. Russ Wheatley
Bureau Manager
Alcohol Beverage Control
Idaho State Police
700 S. Stratford Drive
Meridian, Idaho 83642

[ ] U.S. First Class Mail, Postage Prepaid
[ ] U.S. Certified Mail, Postage Prepaid
[ ] Federal Express
[✓] Hand Delivery
[ ] Facsimile
[ ] Electronic Mail

_____
Kenneth M. Robins
Deputy Attorney General

*SECOND AMENDED COMPLAINT FOR REVOCATION OF*
*RETAIL ALCOHOL BEVERAGE LICENSE (Village Cinema)*
*Page 18*

# EXHIBIT 2

Baker ended up representing himself, as was his right under *Faretta*. But his waiver of the right to counsel and his election to represent himself had to be made " 'knowingly and intelligently.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525 (quoting *Johnson*, 304 U.S. at 464–65, 58 S.Ct. 1019). Baker's election to represent himself, if election it was, was certainly not the "voluntary exercise of his informed free will." *Id.* at 835, 95 S.Ct. 2525. Baker made it distressingly clear that he was going to represent himself because he had no funds. His right to appointed counsel was never adequately explained to him. Baker's trial simply did not meet the standards for waiver of counsel established by the Supreme Court. I would therefore reverse the district court's judgment and remand with instructions to issue the writ.



**LSO, LTD., a California corporation, Plaintiff–Appellant–Cross–Appellee,**

v.

**Jay STROH, Director of the California Department of Alcoholic Beverage Control, in his official and individual capacities; Manuel R. Espinoza, Chief Deputy Director of the California Department of Alcoholic Beverage Control, in his official and individual capacities; David E. Gill, District Supervisor, Rancho Mirage District Office Department of Alco-**

**holic Beverage Control, in his official and individual capacities, Defendants–Appellees–Cross–Appellants.**

**Nos. 98–56093, 98–56349 and 98–56465.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1999.

Filed March 6, 2000.

Private organization which sought to hold "erotic art" exhibition and trade show at city convention center, and which had obtained temporary restraining order (TRO) barring state alcohol control officials from interfering with exhibition through threat of sanctions, brought suit under § 1983, seeking damages, and also seeking prospective declaratory and injunctive relief preventing officials from interfering with future exhibitions. The United States District Court for the Central District of California, Dickran M. Tevrizian, J., granted motion to dismiss claims for prospective declaratory and injunctive relief, and granted summary judgment to officials based on qualified immunity. Organization appealed. The Court of Appeals, T.G. Nelson, Circuit Judge, held that: (1) organization had standing to seek prospective relief; (2) officials could not reasonably have believed that their actions in using alcohol regulations to bar otherwise protected speech were lawful, and thus were not entitled to qualified immunity; and (3) organization was "prevailing party" within meaning of § 1988 with respect to TRO, and thus was entitled to attorney fees.

Affirmed in part, reversed in part, and remanded.

**1. Federal Courts ⊜794**

In reviewing district court's decision dismissing claims for failure to state a cause of action, Court of Appeals must accept all factual allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

LSO, LTD. v. STROH                    **1147**
Cite as 205 F.3d 1146 (9th Cir. 2000)

**2. Federal Courts** ⇒802

In reviewing district court's order granting summary judgment, Court of Appeals views the evidence in the light most favorable to the nonmoving party. Fed. Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**3. Federal Courts** ⇒12.1

Under Article III of Federal Constitution, a federal court lacks jurisdiction unless the plaintiffs present an actual case or controversy. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**4. Federal Civil Procedure** ⇒103.2
    **Federal Courts** ⇒12.1

To satisfy case or controversy requirement of Article III, plaintiffs bringing suit in federal court must have, inter alia, standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**5. Federal Civil Procedure** ⇒103.2, 103.3

Party seeking to invoke federal jurisdiction bears burden of establishing its standing under Article III; to do so, party must show that it has suffered an "injury-in-fact" to a legally protected interest that is both concrete and particularized and actual and imminent, as opposed to conjectural or hypothetical, that there is a causal connection between the injury and the conduct complained of, and that it is likely, and not merely speculative, that its injury will be redressed by a favorable decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**6. Constitutional Law** ⇒42.2(1)
    **Declaratory Judgment** ⇒300

Private organization, which held "erotic art" exhibition and trade show at city convention center, after obtaining temporary restraining order (TRO) barring state alcohol control officials from attempting to prevent organization from holding exhibition by threatening convention center and other businesses with sanctions if show was held, had standing to bring suit in which it sought prospective and declaratory relief barring officials from interfering with future art exhibitions; organization alleged a violation of its own First Amendment rights, rather than a generalized grievance, and faced a realistic threat of future interference. U.S.C.A. Const. Art. 3, § 2, cl. 1; Amend. 1.

**7. Federal Civil Procedure** ⇒103.2

A party with a generalized grievance about government conduct lacks standing to sue. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**8. Constitutional Law** ⇒90(1)

One is not to have the exercise of his liberty of expression in appropriate places, which is protected by First Amendment, abridged on the plea that it may be exercised in some other place. U.S.C.A. Const. Amend. 1.

**9. Federal Courts** ⇒12.1

The difference between an abstract question, and a "case and controversy" within meaning of Article III, is one of degree, and is not discernible by any precise test. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**10. Constitutional Law** ⇒42(2)

Plaintiffs who seek to establish standing to challenge a law or regulation that is not presently being enforced against them must demonstrate a realistic danger of sustaining a direct injury as a result of the law's operation or enforcement. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**11. Constitutional Law** ⇒42(2)

A plaintiff does not have to await the consummation of threatened injury as result of challenged law or regulation to have standing to obtain preventive relief; it is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest, and that there is a credible threat that the challenged provision will be invoked against the plaintiff. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**12. Constitutional Law** ⇒42.1(3)

Persons having no fears of state prosecution except those that are imaginary or speculative are not to be accepted as appropriate plaintiffs, and thus lack standing to challenge constitutionality of statute un-

der which they fear prosecution.  U.S.C.A.
Const. Art. 3, § 2, cl. 1.

**13. Constitutional Law ⊜42(2)**

In considering whether a plaintiff
faces a realistic threat of direct injury as
result of enforcement of statute, as will
confer standing to challenge constitutional-
ity of statute, court considers a variety of
factors; evidence of past instances of en-
forcement is important, but is not disposi-
tive, especially if unaccompanied by any
continuing, present, adverse effects.
U.S.C.A. Const. Art. 3, § 2, cl. 1.

**14. Constitutional Law ⊜42.2(1)**

When threatened enforcement of stat-
ute implicates First Amendment rights,
inquiry in determining whether party who
seeks to challenge statute faces realistic
danger of sustaining direct injury as result
of statute's enforcement tilts dramatically
toward a finding of standing.  U.S.C.A.
Const. Art. 3, § 2, cl. 1.

**15. Federal Civil Procedure ⊜103.5**

A plaintiff needs only to plead general
factual allegations of injury in order to
survive a motion to dismiss based on lack
of standing, as courts presume that gener-
al allegations embrace those specific facts
that are necessary to support the claim.
U.S.C.A. Const. Art. 3, § 2, cl. 1.

**16. Federal Courts ⊜776**

Court of Appeals reviews de novo a
district court's decision to grant summary
judgment on the ground of qualified immu-
nity.  Fed.Rules Civ.Proc.Rule 56, 28
U.S.C.A.

**17. Civil Rights ⊜214(3)**

State officials are entitled to qualified
immunity in performing discretionary
functions if their conduct did not violate
clearly established statutory or constitu-
tional rights of which a reasonable person
would have known.

**18. Civil Rights ⊜240(5)**

Once the defense of qualified immuni-
ty is raised by the defendant, plaintiff
bears the burden of showing that the
rights allegedly violated were clearly es-
tablished; if that burden is satisfied, the

defendant must prove that his conduct was
reasonable.

**19. Civil Rights ⊜214(2)**

First step in qualified immunity analy-
sis is to identify the exact contours of the
underlying right said to be violated; it is
only then that a court should ask whether
the right allegedly implicated was clearly
established at the time of the event in
question.

**20. Civil Rights ⊜214(2), 244**

Qualified immunity determination in-
volves inquiries into (1) identification of
the right that has allegedly been violated,
(2) the determination of whether that right
was clearly established such that a reason-
able official would have known of it, and
(3) the determination of whether a reason-
able officer would have believed that the
challenged conduct was lawful; first two
questions are issues of law, and the third,
although ultimately a legal question, may
require fact finding as well.

**21. Civil Rights ⊜214(3)**

It was clearly established in 1997 that
state liquor regulations could not be used
to impose restrictions on speech that
would otherwise be prohibited under First
Amendment, for purposes of determining
whether state alcohol control officials, who
had allegedly threatened city convention
center and other businesses with sanctions
if private organization was allowed to hold
"erotic art" exhibition and trade show at
convention center, were entitled to quali-
fied immunity from suit brought by organi-
zation under § 1983.  U.S.C.A. Const.
Amend. 1; 42 U.S.C.A. § 1983.

**22. Civil Rights ⊜214(2)**

Inquiry into whether rights allegedly
violated by government officials were
clearly established, as will potentially bar
defense of qualified immunity, should be
conducted in a particularized manner,
rather than a general one.

**23. Constitutional Law ⟡90.4(1)**

Content-based regulation of expression by government, even of indecent expression, is prohibited by First Amendment unless necessary to meet a compelling government interest. U.S.C.A. Const.Amend. 1.

**24. Constitutional Law ⟡90(3)**

Prior restraint of speech is strongly disfavored under First Amendment, and rarely upheld. U.S.C.A. Const.Amend. 1.

**25. Civil Rights ⟡214(3)**

State alcohol control officials could not reasonably have believed that their conduct in allegedly threatening city convention center and other businesses with sanctions if private organization was allowed to hold "erotic art" exhibition and trade show at convention center did not violate clearly established law barring use of state liquor regulations to impose otherwise impermissible restrictions on speech, and thus, officials were not entitled to qualified immunity in § 1983 action brought by organization, even though state regulation under which officials sought to act had never been struck down as violative of First Amendment. U.S.C.A. Const. Amend. 1; 42 U.S.C.A. § 1983; Cal.Code Regs. title 4, § 143.4.

**26. States ⟡18.37**

Under supremacy clause, a state may not immunize its officials from the requirements of federal law. U.S.C.A. Const. Art. 6, cl. 2.

**27. Federal Courts ⟡830**

Court of Appeals reviews district court's award of fees to prevailing party in civil rights action pursuant to § 1988 for abuse of discretion. 42 U.S.C.A. § 1988.

**28. Federal Courts ⟡830**

Court of Appeals reviews an award of costs for abuse of discretion.

**29. Civil Rights ⟡296**

A party to civil rights action "prevails," for purposes of a fee award under § 1988, if it succeeds on any significant issue in litigation which achieves some of the benefit it sought in bringing suit. 42 U.S.C.A. § 1988.

**30. Civil Rights ⟡296**

To be considered a prevailing party entitled to recover attorney fees within meaning of § 1988, civil rights plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant. 42 U.S.C.A. § 1988.

**31. Civil Rights ⟡296**

Civil rights plaintiffs seeking to qualify as "prevailing parties" entitled to attorney fees under § 1988 must establish some sort of clear, causal relationship between the litigation brought and the practical outcome realized. 42 U.S.C.A. § 1988.

**32. Civil Rights ⟡296**

Private organization which had obtained temporary restraining order (TRO), which barred state alcohol control officials from attempting to prevent organization from holding "erotic art" exhibition and trade show at city convention center through imposition of sanctions, was a "prevailing party" within meaning of § 1988, and thus was entitled to award of attorney fees; grant of TRO did not merely preserve status quo, but altered legal relationship between parties by preventing interference with exhibition by officials. 42 U.S.C.A. § 1988.

———

Peter J. Eliasberg, ACLU Foundation of Southern California, Los Angeles, California, for the plaintiff-appellant-cross-appellee.

Dana Thaddeus Cartozian, Deputy Attorney General, Los Angeles, California, for the defendants-appellees-cross-appellants.

Appeals from the United States District Court for the Central District of California; Dickran M. Tevrizian, District Judge, Presiding.  D.C. No. CV–97–05569–DT.

**1150**          **205 FEDERAL REPORTER, 3d SERIES**

Before: D.W. NELSON, BOOCHEVER, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

## OVERVIEW

This litigation arises from the efforts of Appellant Lifestyles Organization, Limited ("LSO") to hold its annual Erotic Art Exhibition and Trade Show in Palm Springs, California, in 1997. According to LSO's complaint, defendants Jay Stroh, Manuel R. Espinoza and David E. Gill, all officials of the California Department of Alcoholic Beverage Control ("ABC"), (collectively the "Officials") attempted to prevent LSO from holding the exhibition. They allegedly did this by threatening the Palm Springs Convention Center (the "Center") and other businesses with sanctions—up to and including loss of their liquor licenses—if they allowed LSO to display its art on their premises. The Officials based these threats on a California law prohibiting the display of certain sexual images, whether or not legally obscene, on the premises of establishments with liquor licenses. After the federal district court issued a temporary restraining order ("TRO") against the Officials, LSO held its event. On appeal, we must decide if LSO has standing to seek prospective and declaratory injunctive relief preventing the Officials from interfering with future LSO art exhibitions. We must also decide if the Officials are entitled to qualified immunity in a suit seeking damages for their actions against the 1997 exhibition. We have jurisdiction under 28 U.S.C. § 1291. We hold that

LSO has standing and that the Officials were not entitled to qualified immunity.[1]

## FACTS AND PROCEDURAL HISTORY[2]

**[1, 2]**  LSO is a California corporation that operates a membership organization consisting of approximately 30,000 members. It has held a convention every year since 1973, and at least seventeen of these have been in California. Since 1991, LSO's annual convention has included a Sensual and Erotic Art Exhibition. This event, according to LSO, is "the premiere exhibition devoted to erotic art in the United States." In addition to the art exhibition, the conventions include a trade show typically featuring a wide variety of exhibitors, including artists and art galleries, members of the travel industry, and publishers. In recent years, several thousand people have attended each convention.

LSO planned to hold its 1997 convention in Palm Springs. It chose the Center, a facility owned and operated by the City of Palm Springs, to host most of the events related to the convention. It contracted with the Center for exclusive use of the Convention Center, including all corridors and public areas, for July 30 through August 2, 1997.[3] According to LSO, its employees and agents invested considerable time and effort to prepare for the organization's convention, especially the art exhibition. LSO planned to follow its longstanding practice of prohibiting alcohol in the area where the art exhibition and trade show were taking place.

---

1. We also affirm the district court's award of attorneys' fees to LSO with respect to the TRO. We do not consider LSO's appeal of the district court's award of costs to the Officials because a new determination of which party "prevailed" will have to be made at the conclusion of proceedings on remand.

2. In reviewing the district court's decision dismissing claims pursuant to Fed.R.Civ.P. 12(b)(6), we must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *See Tworivers v. Lewis,* 174 F.3d

987, 991 (9th Cir.1999). In reviewing the district court's order granting summary judgment, we view the evidence in the light most favorable to the nonmoving party. *See Berry v. Valence Tech., Inc.,* 175 F.3d 699, 703 (9th Cir.1999). LSO was the nonmoving party on the issues of standing and qualified immunity.

3. LSO says it also had planned to display the art exhibition at other venues in California, as it had done after its 1995 convention, but decided against doing so because of the Officials' actions.

# EXHIBIT 3

**The New York Times** | http://nyti.ms/16SfmOb

MOVIES

# Review: In 'Fifty Shades of Grey' Movie, Sex Is a Knotty Business

**Fifty Shades of Grey**

**By A. O. SCOTT**   FEB. 11, 2015

At the end of a recent New York sneak preview of "Fifty Shades of Grey" — in the blackout between the final lines of dialogue ("Anastasia!" "Christian!") and the first breathy notes of the last Beyoncé song — a lot of the audience burst out laughing. The source of that laughter continues to puzzle and intrigue me, perhaps more than the actual movie did. Was it delight? Derision? Embarrassment? Surprise? All of the above?

The last answer seems the most likely, since Sam Taylor-Johnson's screen adaptation of E. L. James's best seller is, like the book itself, a wildly confused treatment of a perennial confusing subject. Sex is a knotty business, perhaps all the more so when actual knots are involved, as they tend to be in the world of Christian Grey, the kinky billionaire bachelor who lends his name and his impressive collection of neckties to this Seattle-set tale of seduction, submission and commodity fetishism.

Christian has a lot of psychic baggage, but for most of this installment in

the "Fifty Shades" trilogy, it's obscured by his physical stuff. In the tradition of Leonardo DiCaprio's Jay Gatsby, James Franco's Alien (from "Spring Breakers") and Kanye West's Kanye West, this young mogul (played by Jamie Dornan) treats luxury consumption as an erotic passion and a spiritual calling. He has his own helicopter, which he pilots himself; an underground garage full of cars with a chauffeur to drive them; a penthouse apartment with a grand piano; and a walk-in closet so big that his suits hang without even touching.

There's also another room where he keeps his collection of canes, cuffs and other specialized equipment. Early in their relationship, he gives a tour to Anastasia Steele, his young inamorata, played with captivating sensitivity by Dakota Johnson. "That's a flogger," he explains, in one of several moments in Kelly Marcel's script that sound a little redundant, and more than a little silly, when uttered on screen.

Anastasia's portion of the dialogue is more likely to be funny on purpose. Critics of Ms. James's books have called attention to Ana's habit of exclaiming "Wow!" and "Holy crap!" when a more heightened vocabulary (or no words at all) might seem to be called for. But the energy that brings her and Christian together is comic as well as sexual. She's an ordinary, guileless, somewhat clueless young woman — kind of basic, as they say nowadays — pulled into the orbit of an enigmatic aristocrat with peculiar tastes and dark secrets. Their first meeting takes place in his office, where Anastasia, with her messy bangs and shapeless blue cardigan, looks absurdly out of place amid the sleek corporate Valkyries. "Fifty Shades" may have begun as "Twilight" fan fiction, but Ms. Taylor-Johnson wittily notes its kinship with "The Devil Wears Prada."

Not that professional ambition plays much of a role in Anastasia's life. Or, for that matter, in Christian's. He runs a big, vague company but doesn't really seem to do much work. Ana is an English major who works part time in a hardware store, which is one of the places Christian shows up to surprise her. He's always doing that — at a nightclub, at her apartment, at a hotel bar in

Savannah, Ga., where she's having a drink with her mom. It's a little unnerving.

Mr. Dornan, given the job of inspiring lust, fascination and also maybe a tiny, thrilling frisson of fear, succeeds mainly in eliciting pity. In print, Christian is a blur and a blank — a screen onto which any given reader can project a customized masculine ideal. On the screen, he risks becoming just some guy, which is how Mr. Dornan plays him, without mischief or mystery. There are actors who might have given Christian a jolt of naughty, bossy life, most of them creatures of an earlier movie era. Cary Grant. William Powell. Paul Newman. Sean Connery if you wanted the roughness a little closer to the surface. Jamie Bell was a convincing dominant in Lars von Trier's "Nymphomaniac: Volume II," though his character was more artisan than aristocrat.

Mr. Dornan has the bland affect of a model, by which I mean a figure made of balsa wood or Lego. What vitality "Fifty Shades of Grey" possesses belongs to Ms. Johnson, who is a champion lip-biter and no slouch at blushing, eye-rolling and trembling on the verge of tears. She's a good actress, in other words, and Ms. Taylor-Johnson matches the colors and the visual texture — the chilly blues and pulsing reds, the drab daylight and the velvety dusk — to Anastasia's moods and desires.

These are kind of a mess. The problem isn't that she's indecisive or conflicted or capricious, or that she reacts to Christian's proposal of a formal, contractually established dominant-submissive relationship with ambivalence. Who wouldn't? (And I'm not passing judgment on his lifestyle. It's just that I have a strong bias against having sex with anyone who would use the word "incentivize" in conversation, as Christian does the very first time he and Anastasia lock eyes.) The problem is that as a character, Anastasia makes no sense. Her behavior has no logic, no pattern, no coherent set of causes or boundaries.

In the book, this hardly matters. In fact, it's something of an asset. Anastasia's inner life exists to fill the space between sex scenes, and her zigzagging responses to Christian's proposals make the fantasy more inclusive while also providing an escape clause. "Fifty Shades" is both daring and conventional, falling back into traditional gender roles even as it plays with transgressive desires. Christian's sexual tastes are intriguing to Anastasia, but they are also the result of emotional wounds that she sets herself the task of healing. He wants to take charge of her, and she wants to take care of him. She tolerates the kind of sex he wants, and even enjoys some of it, but what she really wants is something more, and she wants to make him want that, too. She loves him, but love in these tales functions less as an emotional ideal than as a literary safe word, a return ticket to the land of romance.

Reviewers have complained about Ms. James's pedestrian prose, but the bad writing serves an important purpose. "Fifty Shades" not only destigmatizes kink, bringing bondage and spanking to airport bookstores and reading groups across the land. But it also, so to speak, de-sophisticates certain sexual practices, taking them out of the chateau and the boudoir and other fancy French places and planting them in the soil of Anglo-American banality. If E. L. James were a better writer, her books would be more — to use one of Anastasia's favorite words — intimidating. And much less useful.

The movie is neither one of those things. It dabbles in romantic comedy and splashes around in melodrama, but the one thing it can't be — the thing the novel so trashily and triumphantly is — is pornography. Ms. Taylor-Johnson's sex scenes are not that much different from other R-rated sex scenes, though there are more of them and more hardware is involved. You know the routine: an arched neck, some curled toes, a buttock here, a breast there, a wisp of pubic hair, a muffled moan, another Beyoncé song. Maybe a riding crop for variety.

W.H. Auden once wrote that "the proof that pornography has no literary value is that, if one attempts to read it in any other way than as a sexual

stimulus, to read it, say, as a psychological case-history of the author's sexual fantasies, one is bored to tears." In defiance of this irrefutable good sense, the "Fifty Shades" phenomenon has spawned innumerable kink-themed think pieces, though the analysis has dwelt less on Ms. James's psyche than on the fantasies of the tens of millions of women who have bought her books. The writers transform their boredom into mockery and judgment as they circle around a tantalizing, perhaps frustrating question. Why do so many women read these novels, even though they have no literary value?

I'm no expert, but I can venture a guess: for fun. They seem to be the kind of books you can simultaneously have fun with, make fun of, trash and cherish and adapt to the pursuit of your own pleasures. Which brings me back to the laughter at the end of the sneak preview. "Fifty Shades of Grey" might not be a good movie — O.K., it's a terrible movie — but it might nonetheless be a movie that feels good to see, whether you squirm or giggle or roll your eyes or just sit still and take your punishment.

*"Fifty Shades of Grey" is rated R (Under 17 requires accompanying parent or adult guardian). Different strokes.*

**Fifty Shades of Grey**

*Opens on Friday*

Directed by Sam Taylor-Johnson; written by Kelly Marcel, based on the novel by E. L. James; director of photography, Seamus McGarvey; edited by Debra Neil-Fisher, Anne V. Coates and Lisa Gunning; music by Danny Elfman; production design by David Wasco; costumes by Mark Bridges; produced by Ms. James, Michael De Luca and Dana Brunetti; released by Universal Pictures. Running time: 2 hours 4 minutes.

WITH: Dakota Johnson (Anastasia Steele), Jamie Dornan (Christian Grey), Jennifer Ehle (Carla May Wilks), Marcia Gay Harden (Grace Trevelyan Grey) and Victor Rasuk (José).

A version of this review appears in print on February 13, 2015, on page C1 of the New York edition

with the headline: When Love Wears a Blindfold.

---

© 2016 The New York Times Company

# EXHIBIT 4

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/fifty-shades-of-grey-review-romance-on-the-ropes-1423771731

ARTS | FILM

# 'Fifty Shades of Grey' Review: Romance on the Ropes

The first book of the E.L. James trilogy comes to the feature screen.

By **JOE MORGENSTERN**
Feb. 12, 2015 3:08 p.m. ET

Reasonable minds may differ on the nature of the playroom in "Fifty Shades of Grey."

The naive heroine, Anastasia Steele (Dakota Johnson), first refers to it as "that room of pain." The surpassingly rich—and, shades of Krafft-Ebing, sexually deviant—hero, Christian Grey (Jamie Dornan), contends that the room is about pleasure. What's for sure is that it's about gain. The E.L. James trilogy has already earned three successive fortunes in a triumph of provocative content over pitiful prose style. Now the movie version, directed with considerable flair by Sam Taylor-Johnson, is poised to reap new zillions, and why not? It's billionaire-glossy, as much an ode to consumerism as a study in sadomasochism; intermittingly titillating, with fugitive flashes of droll; and, bondage apart, a dutifully romantic tale of an old-fashioned girl who takes a particularly roundabout route to true love.

> Inquiring minds may want to know how kinky things get to be, but the question on that count is compared with what?

The sex sequences are downright genteel compared with the grim depersonalization of

Bernardo Bertolucci's "Last Tango in Paris." These lovers, or bedchamber duelists, share power equally if intricately, and they chatter endlessly about feelings, or, in Christian's case, a lack of them. The ties that bind the two seem terribly earnest compared to the trippy eroticism of Pedro Almodóvar's "Tie Me Up! Tie Me Down!" Unlike the grisly torture inflicted in "The Girl With the Dragon Tattoo," the sadism here is consensual, indeed contractual, an approach that might serve as a shining example for heedless football players. (Since Christian is bent on biting Ana's lip, their contract is less prenup than prenip.) The novel's notorious tampon scene has been excised. Another passage in the book, when Ana savors her first oyster, has also been dropped, presumably on the theory that the movie's target demographic shares more of an interest in sex than in mollusks.

Still, "Fifty Shades of Grey" delivers, however

---

MORE REVIEWS

- 'Kingsman: The Secret Service' (/articles/SB10530567965804683707904580457780891242138)
- 'Humpback Whales' (/articles/SB10530567965804683707904580457781815054748)

---

ponderously, on its promise of pop transgressiveness. Christian does in fact spank, bind, gag and blindfold the doggedly submissive Ana in the course of his quasi-amours, then set upon her with tools of his dominance trade that include a peacock feather (she doesn't seem ticklish), an ice cube (we've seen ice cubes in women's navels before—what about in men's?) and a flogger. (A whipping with a leather belt comes closer to ugly than anything else, but gauzy-ugly, because artfully photographed by the estimable Seamus McGarvey.)

In pursuit of an appropriate acting style, the director and her appealing co-stars have reinvented the telegraph. They use it adroitly, however, communicating their knowledge of what they're up to without letting excessive self-awareness spoil the fun.

Ms. Johnson has the greater challenge in this department, and she pulls it off with aplomb—selling a portrait of a country mouse from Portland, Oregon, wide-eyed and all but dumbstruck in the presence of the world's most eligible billionaire bachelor (*he wants me?*) when everyone who has read the book and almost anyone who hasn't knows perfectly well that Ana will soon come around to a rich sense of possibility and an appetite for exploration. (One briefly foolish moment, clumsily staged and unconvincing, is the fall she takes upon entering Christian's Seattle office for the first time.)

Mr. Dornan's appeal is more straightforward, even though his character, Prince

RELATED

- New 'Outlander' Trailer to Screen Before 'Fifty Shades of Grey' This Weekend (http://blogs.wsj.com/speakeasy/2015/02/13/new-outlander-trailer-to-screen-before-fifty-shades-of-grey-this-weekend/)
- Online Tickets Seek Bigger Role at Movies (http://www.wsj.com/articles/online-tickets-seek-bigger-role-at-the-movies-1423782268)

Semicharming, is more complex. The actor makes Christian articulate, hot, intelligent, hot, quietly authoritative, hot, sensitive in certain aspects of life (post-coital interpretations of Beethoven and Villa-Lobos that he plays on the grand piano in his palatial apartment) yet not so introspective that he can't be seen for what the books have shrewdly made him—the world's most unlikely wounded bird, a tortured billionaire who has been waiting most of his 27 years for the loving ministrations of a good woman.

Will audiences see him that way from the outset? Probably; that's a big part of what sold the books. They'll certainly see him as a dispenser of luxury goods and services that will help sell the film. In exchange for her painstakingly negotiated favors, Ana gets to go up in his helicopter, wear lovely clothes, attend nice parties, drive her own spanking-new car and soar on silent wings in a sailplane. The last time a sailplane figured prominently in a movie seduction was in the remake of "The Thomas Crown Affair," when Pierce Brosnan took Rene Russo for a long and rapturous ride in a gorgeous Duo Discus. Ana's ride in Christian's DG-1000 is much shorter, but pilot and passenger alike make up for lost time on the ground.



REWIND

## DVD // Streaming // Download
## 'Nowhere Boy' (2009)

In her feature debut, Sam Taylor-Johnson (then Sam Taylor-Wood) directed this modest and enjoyable account of the young John Lennon. The film is framed as a coming-of-age drama about a gifted youngster caught in a no-boy's land between an aunt who raises him and a loving mom who's too tormented to mother him. John is played by Aaron Johnson, who makes him a strong presence, and a credible one. Kristin Scott Thomas, as Aunt Mimi, transforms a prim martinet into a powerfully loving influence in John's life.

# EXHIBIT 5

# The Washington Post

Movies

# 'Fifty Shades of Grey' movie: A better adaptation than the book deserves

**By Stephanie Merry** February 12, 2015

The movie adaptation of E.L. James's best-selling book "Fifty Shades of Grey" was always destined to be a blockbuster; the quality of the film was beside the point.

After all, the erotic romance novel, based on saucy "Twilight" fan-fiction, did great business, despite being a 500-page lesson in how not to use a thesaurus. Millions of readers paid their dues, skimming countless boring scenes with a narrator who says nothing more profound than "holy cow!" and "double crap!" so they could get to the good stuff: bondage-laced sex scenes between the story's innocent protagonist and her impossibly hot, impossibly rich damaged-goods love interest.

So you have to hand it to director Sam Taylor-Johnson and screenwriter Kelly Marcel for making a film that, while not as titillating as the book, is a much better adaptation than the source material deserves.

The pair stripped out the more idiotic dialogue — leaving behind one "holy cow" —streamlined the preposterous plot and, most important, made a very smart casting decision by placing Dakota Johnson, the daughter of Melanie Griffith and Don Johnson, in the lead role.

Between pratfalls and perfectly timed facial expressions, Johnson brings a steady stream of humor to the part of college senior Anastasia Steele, while also nailing the sexy ingenue vibe. It's immediately clear that Johnson is up to the task of transforming an annoying, even embarrassing character into a likable one: When Anastasia first enters the Seattle offices of billionaire Christian Grey, she looks around in wonder at the tall, impeccably dressed blondes that work for him, before glancing down at her own getup with a hilarious look of dismay.

The slightly unkempt Anastasia is there to interview the 27-year-old self-serious entrepreneur for the school newspaper. In both the movie and the book, the awkward first meeting begins with Anastasia taking a spill as soon as she enters the office. From there, the novel quickly becomes an overwrought description of funny feelings down below, while the movie wisely keeps things in comedic territory for as long as possible.

Comedy and chemistry are not mutually exclusive, but during this opening scene of supposed animal magnetism, the spark doesn't quite materialize. Irish actor Jamie Dornan portrays the wounded moneymaker with such restraint that he never channels anything more than his own good looks (which are indeed very good). In any case, so begins a

flirtation between the two that ultimately leads to a nondisclosure agreement — never a good sign during a relationship's early stages — followed by an introduction to Christian's "playroom." Or, as Anastasia calls it, his Red Room of Pain: a locked chamber in Christian's penthouse where he likes to get busy with the help of various implements — floggers, whips, shackles, you know, the usual.

All of which leads to yet another contract. Will the virginal Anastasia agree to be the submissive to Christian's dom? He's upfront about the fact that he doesn't "do romance," but he likes her so much, he's willing to sweeten the deal. If she spends each weekend being, essentially, his sex slave, he'll spend one night a week doing normal couple things. Two days of punishment in exchange for dinner and a movie seems like a raw deal in every sense, and Johnson makes this whole ridiculous scenario seem believable by responding not with impassioned earnestness but with a healthy dose of incredulity: "What do I get out of this?"

That contract is about as much plot as you're going to get. Whether she will sign on the dotted line is the mystery that powers the narrative, and it isn't much to go on. Of course, the tedium of doing business is broken up by about 15 minutes of sexcapades. Compared to the book, which features a much-discussed scene involving a tampon, the movie is a model of moderation. Every sexual encounter plays out to the soothing strains of some lovely vocalist (Sia, Beyoncé), and careful framing means we see plenty of skin, but not as much as you might expect for a chronicle of fringy sexual habits. Dornan doesn't even get totally naked for the camera.

Taylor-Johnson clearly was going for an R rating, and even with what the MPAA deemed "unusual behavior" — including one difficult-to-watch whipping — no scene comes close to earning an NC-17 designation.

In the end, there's nothing here we haven't seen before. But there's also nothing as agonizingly awkward as James's prose.

## Fifty Shades of Grey

 ★ ★

(125 minutes, at area theaters) is rated R for strong sexual content including dialogue, some unusual behavior and graphic nudity, and for language.

Washington-area native Stephanie Merry covers movies and pop culture for the Post.

**Your Three.**
Video curated for you.



This isn't your daddy's gun club


Learn to make traditional soup dumplings
1:19


Is fencing the answer to brain health?
1:28

**Show Me More**

# EXHIBIT 6

**From:** Jeremy C. Chou
**Sent:** Saturday, November 21, 2015 3:55 PM
**To:** 'Robins, Ken'
**Subject:** RE: Village Cinema

Hey Ken,

Do you have time next week to meet before our Dec. meeting?  I want to discuss this case with you.

Let me know.

Thanks,
Chou

**From:** Robins, Ken [mailto:ken.robins@isp.idaho.gov]
**Sent:** Wednesday, November 18, 2015 1:23 PM
**To:** Jeremy C. Chou
**Subject:** RE: Village Cinema

This works for me.  We'll see you on the 3rd.

Kenneth M. Robins
Deputy Attorney General
Idaho State Police
(208) 884-7055

CONFIDENTIALITY NOTICE: This e-mail is intended only for the personal and confidential use of the individual(s) named as recipients (or the employee or agent responsible to deliver it to the intended recipient) and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It may contain information that is privileged, confidential and/or protected from disclosure under applicable law including, but not limited to, the attorney client privilege and/or work product doctrine. If you are not the intended recipient of this transmission, please notify the sender immediately by telephone. Do not deliver, distribute or copy this transmission, disclose its contents or take any action in reliance on the information it contains.

**From:** Jeremy C. Chou [mailto:jcc@givenspursley.com]
**Sent:** Wednesday, November 18, 2015 11:40 AM
**To:** Robins, Ken
**Subject:** Village Cinema

Hi Ken,

Looks like we are scheduled to meet at ISP on Dec. 3rd to discuss the complaint against Village Cinema, et al.  As discussed, thanks for giving us an extension to respond to the administrative complaint until after our meeting.  If I misunderstood, please let me know.

1

Thanks again,
Jeremy Chou

---

JEREMY C. CHOU

GIVENS PURSLEY LLP

601 W Bannock St, Boise, ID 83702
main 208-388-1200
direct 208-388-1211
cell 208-860-0297
fax 208-388-1300
jcc@givenspursley.com
www.givenspursley.com

---

CONFIDENTIALITY NOTICE: This communication is confidential and may contain privileged information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT 7

Ken,

When you can, will you call me on my cell at (208) 860-0297?  Now that Brian Kane has spoken, I would like to talk about what ABC wants to do.

As for the Village Cinema, they feel like they are in a box.  Serving drinks during a movie is part of their business plan.

The obvious concern is the next time they show even a PG -13 movie with a breast caress, there is a risk of continuing anonymous complaints by competing theaters.

I really do feel that the 9th circuit case is on point here.  I remain hopeful that you come to the same conclusion, but if you disagree, I really don't know what other option we have except for a judicial remedy.


Jeremy